**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

KEVIN MITCHELL,                                 )
on behalf of Plaintiff and the class            )
members described herein,                       )
                                                )
          Plaintiff,                           )
                                                )
      v.                                    )
                                                )
READYSETGO FINANCE;                             )
GLOBEX HOLDINGS, LLC;                           )
JOHN WESTON KIMBALL;                            )    DEMAND FOR TRIAL BY JURY
and JOHN DOES 1-20;                             )
                                                )
          Defendants.                          )

## COMPLAINT – CLASS ACTION

1.      Plaintiff, Kevin Mitchell, brings this action against Defendants (a) ReadySetGo Finance, (b) Globex Holdings, LLC ("Globex"), (c) John Weston Kimball ("Kimball"), and (d) John Does 1-20 to secure redress for usurious and illegal loans (such as Exhibit A) made to Indiana residents.

2.      Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under RICO (Count II).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d), in that the amount in controversy on a classwide basis exceeds $5 million, exclusive of interest and costs, and in that there are believed to be over 100 members of the class, all of whom are of diverse citizenship to Defendants.

4.      This Court has personal jurisdiction over each Defendant because they knowingly participated in the making of unlawful loans to Indiana residents.

5.      Venue is proper because acts to make and collect the loans impacted Plaintiff in the

Southern District of Indiana.

6.      As set forth below, Defendants operate interactive websites through which they sought to and did make loans to Indiana residents. The use of an interactive website which permits Indiana residents (but not residents of specified other states) to apply for loans, along with the making and collecting of loans within the state, establishes a purposeful availment of Indiana and is sufficient to establish personal jurisdiction over the defendants responsible for the site. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

7.      Article III is satisfied because actions for usury, including reduction or voiding of loans and statutory damages, were entertained by courts in the United Kingdom (Usury Act of 1713, 12 Anne s. 2 c. 17) and all of the original states in 1789.

## PARTIES

8.      Plaintiff Kevin Mitchell is a natural person who at all times relevant has resided in Indianapolis, Indiana.

9.      Defendant ReadySetGo Finance is an entity organized by the Kashia Band of Pomo Indians of the Stewarts Point Rancheria, a federally-recognized American Indian tribe ("Tribe"). It uses the address PO Box 582, Santa Rosa, CA 95402.

10.      Defendant ReadySetGo Finance claims to be "a sovereign enterprise wholly-owned by Kashia Services, an economic development arm and instrumentality of, and wholly-owned and controlled by the" Tribe. As set forth below, this is not true.

11.      Globex is a Missouri limited liability company with a principal business address of 5705 NW 64th Terrace, Kansas City, MO 64151. Its registered agent is John Kimball at that address.

12.      Globex beneficially owns and controls several online high-interest lending websites, including ReadySetGoFinance.com and GeyserLending.com.

13.       Globex does business in Indiana over the internet, contacting and interacting with Indiana consumers via text message, email, Automated Clearing House transactions, telephone,

and postal mail.

14.     John Weston Kimball is a natural person. He is the chief executive officer, owner, and only managing member of Globex. On information and belief, Kimball resides at 6109 N. Mattox Road, Kansas City, MO 64151.

15.     Defendants John Does 1-20 are other natural or artificial persons who participated in the Internet lending scheme complained of herein.

## FACTS RELATING TO LOAN TO PLAINTIFF

16.     On May 6, 2021, Plaintiff obtained a $650 loan (Exhibit A) from ReadySetGo Finance, via its website, www.readysetgofinance.com.

17.     The loan had a disclosed annual percentage rate of 708.32%. The loan was to be repaid over an eight month period. Total payments were $3,567.79.

18.     Plaintiff applied for the loan from Indiana, via the Internet. The loan proceeds were wired to Plaintiff's bank account in Indiana. Payments were made via ACH debit from Plaintiff's bank account in Indiana.

19.     This is Defendants' standard practice with respect to making and repayment of loans.

20.     Plaintiff made some of the payments, including interest. Defendants claim some are still due.

21.     At no time did Plaintiff visit any place of business of ReadySetGo Finance or step foot on the Tribe's land.

22.     Plaintiff obtained the loan for personal, family or household purposes.

23.     The loan agreement (Exhibit A) is a standard form.

24.     The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California

constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

25.     Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana, and are not in fact made by any Native American tribe.

26.     The actual lending operations were carried out and continue to be carried out in locations other than tribal lands.

27.     The operations that are not conducted on tribal land include lead generation, marketing, funding, underwriting, payment processing, and collection.

28.     At most, the Tribe receives a small fee for each loan made.

29.     The bulk of the profits from the lending activities are received by non-members of the Tribe.

30.     Kimball is a veteran of the online high-interest lending industry, and he controls and owns, through Globex, several online payday lenders, including Geyser Lending and ReadySetGo Finance.

31.     ReadySetGo Finance operates from readysetgofinance.com and makes loans to consumers at interest rates exceeding 700%.

32.     Contrary to the statement about tribal ownership on its website, ReadySetGo Finance was, at all times relevant to this lawsuit, actually beneficially owned and operated by Globex through Kimball and other investors.

33.     To avoid usury laws of states such as Indiana, lenders such as Globex entered into arrangements with financially desperate American Indian tribes. The tribes would become the straw owners of a lending enterprise and claim that the loans were made on their reservation, under their tribal laws, providing a colorable sovereign immunity defense from state prosecution for loan sharking.

34.     Such arrangements are referred to as "rent-a-tribe" schemes because the main function of the Indian tribe is to appear, on paper at least, to control the lending operation so that

the lender qualifies for sovereign immunity.

35.     In fact, non-Indians control the enterprise, giving the tribal entity little actual authority and controlling the way the loans are marketed, underwritten, collected, and serviced.

36.     In the case of ReadySetGo Finance, Kimball, through Globex, pays the Kashia Tribe a nominal amount – around two percent of revenues – to claim ownership of the online payday lending entity, making it appear as though ReadySetGo Finance is owned by an Indian tribe and operating on an Indian reservation.

37.     The Kashia Tribe is a small, isolated tribe with a 550-acre reservation and approximately seventy-eight members. The Kashia Tribe has no real economic prospects and has struggled economically for decades.

38.     Thus, the Kashia Tribe has been willing to profit off one of its few assets, its sovereign immunity, by allowing a large number of non-tribal investors to use its name and create more than a dozen "rent-a-tribe" agreements.

39.     Any involvement the Kashia Tribe had in making or collecting the ReadySetGo Finance loan made to Plaintiff was nominal and periphery.

40.     Globex, not the Kashia Tribe, was the true lender of Plaintiff's loan, because it has the predominant economic interest in loans made to consumers.

41.     Despite the Kashia Tribe operating nearly a dozen different payday lending websites, only two of them share a common IP address — Geyser Lending and ReadySetGo Finance, which are, not coincidentally, the only two of which are controlled by Globex and Kimball.

42.     Geyser Lending operates from an IP address of 64.207.179.176, which is not near the Kashia Tribe. ReadySetGo Finance operates from the identical IP address. (Exhibit B)

43.     When ReadySetGo Finance obtains credit reports on consumers from Trans Union, the phone number associated with the inquiry appearing on the particular consumer's credit disclosure is 816-591-4056.

44.     The 816 area code is assigned to the Kansas City area. The number 816-591-4056 is

Kimball's phone number.

45.     On information and belief, the capital used to make the loans made through

www.readysetgofinance.com comes from Kimball or his business associates.

## INDIANA REGULATION OF LENDING

46.     The Indiana Uniform Consumer Credit Code, Ind. Code §§ 24-4.5-3-201 and

24-4.5-3-508, establishes a maximum loan finance charge of 36% per annum for most consumer

loans.

47.     Higher rates on small consumer loans are authorized by Ind. Code § 24-4.5-7-101 *et*

*seq.*, but not as high as 779% (15% of the first $250 of principal and 13% of the next $150 for a loan

of at least 14 days).

48.     Ind. Code § 24-4.5-7-101 *et seq.*, also imposes other restrictions designed to prevent

consumers from becoming overextended. Defendants do not even purport to comply with these

restrictions.

49.     The rate and amount of finance charge provided for in Exhibit A is more than

double that permitted in Indiana on any consumer loans.

50.     Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans
made in this state and to modifications, including refinancings, consolidations, and deferrals,
made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the
following apply: . . .

   (c) A loan or modification of a loan agreement is made in this state if a writing signed
   by the debtor and evidencing the debt is received by the lender or a person acting on
   behalf of the lender in this state.

   (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction
   occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer
   sale, lease, or loan transaction with a creditor or a person acting on behalf of the
   creditor in another state and the creditor or the person acting on behalf of the
   creditor has advertised or solicited sales, leases, or loans in Indiana by any means,
   including by mail, brochure, telephone, print, radio, television, the Internet, or
   electronic means.

   (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a
   resident of Indiana enters into a consumer sale, lease, or loan transaction secured by

-6-

an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

51.     Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . .  (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

**(4)** ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . .  (Emphasis added)

52.     Additional remedies are provided by Ind. Code § 24-4.5-7-409:

Applicability of other statutory provisions — Penalty for violations of chapter — Equitable relief — Remedies not exclusive.

(1) This section applies to licensees and unlicensed persons.

(2) A person who violates this chapter:

      (a) is subject to the remedies provided in IC 24-4.5-5-202;

      (b) commits a deceptive act under IC 24-5-0.5 and is subject to the penalties listed in IC 24-5-0.5;

      (c) has no right to collect, receive, or retain any principal, interest, or other charges from a small loan; however, this subdivision does not apply if the violation is the result of an accident or bona fide error of computation; and

      (d) is liable to the borrower for actual damages, statutory damages of two thousand dollars ($2,000) per violation, costs, and attorney's fees; however, this subdivision does not apply if the violation is the result of an accident or bona fide error of computation.

The remedies described in this subsection are in addition to all other remedies set forth in this article. . . .

(4) The remedies provided in this section are cumulative but are not intended to be the exclusive remedies available to a borrower. A borrower is not required to exhaust any

administrative remedies under this section or any other applicable law.

## DEFENDANTS' RENT-A-TRIBE SCHEME

53.     In order to evade the restrictions of Indiana's lending laws, Kimball and Globex devised a scheme to engage in a business model commonly referred to as a "Rent-a-Tribe" scheme.

54.     In such schemes, non-Native American lenders attempt to circumvent state and federal laws prohibiting usury by issuing loans in the name of a business purportedly associated with a Native American tribe and shielded from state law by tribal sovereign immunity.

55.     However, the tribal entity is a mere front for an illegal lending scheme, all substantive aspects of which are conducted by individuals an entities not connected with any tribe.

56.     The Tribe actively seeks to rent its name and sovereign immunity to private parties. It has numerous simultaneously-active "rent-a-tribe" arrangements with non-tribal investors.

57.     An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

58.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

59.     An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

60.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and

-9-

overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

61.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

62.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

63.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

64.     Plaintiff incorporates paragraphs 1-63.

65.     Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff is entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

66.     Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

67.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "ReadySetGo Finance" at more than 36% interest (all of its loans qualify)

(c) on or after a date two years prior to the filing of this action.

68.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

69.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

70.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

71.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

72.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

73.     Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

74.     The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

          i.     Statutory damages;

         ii.     Attorney's fees, expenses and costs; and

       iii.     Such other or further relief as is appropriate.

## COUNT II – RICO

75.     Plaintiff incorporates paragraphs 1-63.

76.     This claim is against Kimball and Globex, who are the RICO "persons."

77.     All loans made in the name of "ReadySetGo Finance" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

78.     The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

79.     "ReadySetGo Finance" is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

80.     Defendant Kimball is associated with this enterprise.

81.     Defendant Globex is associated with this enterprise.

82.     Defendants Kimball and Globex  conducted or participated in the conduct of the affairs of this enterprise through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

83.     Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

84.     Plaintiff brings this claim on behalf of a class.

85.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "ReadySetGo Finance" at more than 72% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

86.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

87.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant

-12-

common questions are:

    a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

    b.    Whether "ReadySetGo Finance" is an "enterprise."

    c.    Whether Defendants Kimball and Globex are associated with this enterprise.

    d.    Whether Defendants Kimball and Globex conducted or participated in the affairs of the enterprise through a pattern of making and collecting unlawful loans.

88.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

89.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

90.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.    Treble damages;

    ii.    Attorney's fees, litigation expenses and costs of suit; and

    iii.    Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.


                                        */s/ Daniel A. Edelman*
                                        Daniel A. Edelman

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>DOCUMENT PRESERVATION DEMAND</u>

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

<u>*/s/ Daniel A. Edelman*</u>
Daniel A. Edelman